CHAPMAN ET UX. *v.* THOMAS

(Two Appeals in One Record)

[No. 3, October Term, 1956.]

*Decided November 5, 1956.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON and HAMMOND, JJ., and HENDERSON, J., Chief Judge of the Fourth Judicial Circuit, specially assigned.

*Earl J. Lombard,* with whom were *William A. Gallagher* and *Lombard & McClure* on the brief, for the appellants.

The Court declined to hear argument for the appellee.

*William R. Thomas, III, pro se,* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The appeal is by the sellers in a contract for the sale of two building lots from a decree for specific performance granted the purchaser. On June 21, 1954, by written contract, Ralph Chapman and Katheryn D. Chapman, his wife, sold, and William R. Thomas, III, purchased lots 11 and 12 of block 103, Garrett Park, Montgomery County, at a price approximately $1,000 less than the original asking price. The contract provided that within thirty days from its date "or as soon thereafter as a report on the title can be secured if promptly ordered", settlement was to be made. Neither expressly nor by implication was time made of the essence of the contract. Thomas, the purchaser, immediately ordered a title search, a survey and plans for the erection of his house. He obtained from the Veterans Administration a certificate of

reasonable value in preparation for the securing of a loan to finance the building of the house, and within a few days of the date of the contract had deposited in bank substantially more than the amount of the purchase price in preparation for settlement. About three weeks after the contract had been signed, the title company advised Thomas that the property had been sold at tax sale for non-payment of 1953 taxes. Just before he heard this news, the surveyor had told him that a preliminary survey disclosed a pie-shaped encroachment or overlap, ten feet at the widest point, of lots 14 and 15 on lot 12. He learned that the owners of lots 14 and 15 claimed part of lot 12 under a previous survey. The title company advised Thomas that it could not guarantee the title without an exception and that it was unlikely that any lender would make a construction loan until the matter was cleared up. Thomas said also that his plans called for use of the full eighty-one feet of frontage and that the encroachment cut this down by ten feet, and made his plans unusable. He testified that he visited the Chapmans and advised them of the overlap and was told that they would take whatever steps were necessary to clear up the matter. He said also that a few days later he saw Mrs. Chapman again and told her about the taxes and was assured that they would be paid, and at that time was again told that the overlap would be cleared up. His further testimony was that he waited until July 30 or 31 and, having heard nothing from the Chapmans, went to their home to see if they would be willing to pay half of the cost of an additional survey which was said to be necessary. Mrs. Chapman then told him that she would take no action whatever to clear up the overlap but would be willing to take back title to the lots and cancel the contract. He told her that this was not acceptable and that he would not cancel. On August 5 or 6, after his additional survey was finished, Thomas arranged a tentative settlement date with Mrs. Chapman for August 16 and notified the title company. On either August 15 or 16, he received a call from Mrs. Chapman, saying that they could not settle on that date because Mr. Chapman, who works for the American Legion, was busy preparing for a convention to be held on August 30. There was further testi-

mony to the effect that a few days later Thomas called Mrs. Chapman again and was told that her husband wanted to examine the deed, that the deed was sent, that a lawyer employed by the Chapmans requested a change in the deed, and that the change was made and the deed returned to the lawyer. On September 4, when Thomas again called, seeking to settle, Mrs. Chapman told him that they would not go through with the contract. Four days later, he received a letter from Mrs. Chapman advising him that·the thirty day settlement period had expired and that the contract was no longer valid. Enclosed was a check for the amount of his deposit. Thomas returned the check by registered mail and requested the title company to arrange settlement on September 15. The title company sent a registered letter to the Chapmans, advising them of the settlement date. Both registered letters were returned unclaimed. The Chapmans did not appear on the settlement date although their lawyer had been notified by the title company by regular mail when it would be held. Thomas was present, prepared to go through with the settlement and, in fact, tendered the settlement officer the balance of the purchase price called for by the contract.

Mrs. Chapman denied much of that to which Thomas had testified. Her version of what occurred was that she considered the contract ended as of July 30 or 31 and that she made no date to settle on August 16. The Chancellor found, justifiably we think, that her testimony was not convincing, that the testimony of Thomas was convincing and that in much of it he was corroborated by Mr. Chapman.

We find the Chancellor to have been right in decreeing specific performance. While its granting or withholding lies in the sound discretion of the court, "This discretion is not, however, arbitrary; and where the contract is, in its nature and circumstances, unobjectionable—or, as it is sometimes stated, fair, reasonable and certain in all its terms—it is as much a matter of course for a court of equity to decree specific performance of it as it is for a court of law to award damages for its breach." *The Glendale Corp. v. Crawford,* 207 Md. 148, 154, and cases cited.

The contract here answers the description of one justify-

ing specific performance. The appellants' argument to the contrary, which we find untenable, is that Thomas did not show himself ready and eager to perform, and was in default for not settling within thirty days. Whether time is or is not of the essence in a contract for the sale of real estate, a purchaser who seeks specific performance has two primary obligations. First he must seek relief with due diligence and show that under all the circumstances he was "ready, desirous, prompt, and eager", as an early English case, quoted with approval in *Doering v. Fields,* 187 Md. 484, 488, put it. See, too, *Raith v. Cohen,* 142 Md. 38, 50; *Soehnlein v. Pumphrey,* 183 Md. 334, 338. Second, if he delays settlement while attempting to have the seller remedy a claimed defect in the title of the property, he must, when it becomes clear the seller will not meet his demands, either accept the title as it is and promptly tender settlement, or cancel the contract. *Newman v. Johnson,* 108 Md. 367; *Vincenti v. Kammer,* 189 Md. 523, 531. In the present case Thomas' good faith and his sincere intention to take the lots and pay for them was evident from start to finish. As soon as it was clear that the Chapmans would take no action to clear up the matter of the encroachment, Thomas, after very promptly finishing the survey at his expense, immediately offered to take the lots either relying on the last survey as clearing up the encroachment or taking the lots as they were. He made repeated efforts to bring about a settlement and each time was rebuffed by the Chapmans, who were determined not to go through with the contract.

Here time was not of the essence. "The accepted doctrine is that in the ordinary case of contract for the sale of land, even though a certain period of time is stipulated for its consummation, equity treats the provision as formal rather than essential, and permits the purchaser who has suffered the period to elapse to make payments after the prescribed date, and to compel performance by the vendor notwithstanding the delay * * *. The doctrine is subject to qualifications, one of the most important of which is that the delay must not be willful and must not have worked any harm to the vendor." *Soehnlein v. Pumphrey,* cited above, 183 Md. 334, 338. In

that case Judge Delaplaine, speaking for the Court, went on to point out that "The maxim 'equity aids the vigilant rather than those who slumber on their rights' is applicable to parties seeking specific performance of contracts. * * * But where the purchaser has not been grossly negligent and invokes the aid of equity in good faith and with reasonable diligence, and the situation of the parties has not changed, the court will not refuse to decree specific performance merely because he was unable to comply strictly with the terms of the contract."

In *Doering v. Fields*, 187 Md. 484, 489, to which we have referred, a case where time was not of the essence, Chief Judge Marbury said for the Court: "In each case the Court decides whether it is right and just that a specific performance should be decreed. If the vendee has not unduly delayed, if the vendor is not hurt, then the decree will be granted." See, too, *Pratt v. Gray*, 139 Md. 472; and *Sealock v. Hackley*, 186 Md. 49, 53-54.

The Chancellor found, we think correctly, that Thomas acted in entire good faith and with due diligence, particularly since the Chapmans were aware of the cause of the delay and agreed at first that they would either remove the cause or cooperate in its removal. The delay was not undue and the Chapmans were not hurt by it.

The appellants contend that the sale was made primarily because Mrs. Chapman needed cash quickly by reason of illness in her family and would not have sold if its receipt were to be delayed. Seemingly, this is intended to amount to a contention that time was of the essence and that Thomas' failure to settle within thirty days deprived him of the right to specific performance. Generally, if time is of the essence, failure to perform within the stipulated time will prevent specific performance at the suit of the defaulter. *Triton Realty Co. v. Frieman*, 210 Md. 252, 259; *Budacz v. Fradkin*, 146 Md. 400, 407; *Garbis v. Weistock*, 187 Md. 549; *Soehnlein v. Pumphrey, supra; Abrams v. Eckenrode*, 136 Md. 244. However, failure to perform may be legally justified and if this is the case, the mere passage of the day for settlement will not of itself prevent specific performance. *Budacz v. Fradkin, supra.*

As we have indicated we see nothing in this case to show that time was of the essence of the contract. If it be assumed that it was, and so that it was necessary—which it is not—to decide the case on that premise, it would seem that enough of the tests of what is legal justification for failure to perform by a purchaser were met by Thomas. The *Budacz* case discusses the cases that have set forth these tests as to title weaknesses or defects, and its conclusions may be summarized in this way. The vendee is entitled to receive what he bought and is not bound to accept anything short of an unencumbered legal estate in fee. While a purchaser cannot demand a title which is absolutely perfect, a court of equity will see that he gets a title which is free from reasonable doubt, a doubt that is considerable and rational, one which would induce a prudent man to pause, one not based on captious, frivolous and astute niceties but such as to produce "real *bona fide* hesitation in the mind of the Chancellor." In the case before us, Thomas was advised by the title company that unless the encroachment was cleared up, he could not get a completely good title or secure a loan and, further, the encroachment took ten feet from the front of his lots and so interfered with their use as planned. We think that his doubt as to the title was considerable and rational, and not captious, or based on astute niceties, and there is no question but that it produced a real *bona fide* hesitation in the mind of the Chancellor.

Appellant urges upon us that the Chancellor exceeded his discretion in requiring the filing of a *supersedeas* bond, and in denying appellants' motion to set aside and void a deed to Thomas from a trustee appointed by the court when the bond was not filed. Rule 16 of the Rules of the Court of Appeals provides: "The appellant or appellants, if the defendant or defendants in the cause, upon praying such appeal, in order to stay the execution or enforcement of the judgment appealed from, shall tender and file in the cause an appeal bond, in such form and with such sureties, as may be approved by the Court, the penalty in such bond not to exceed, in any case, the sum of ten thousand dollars."

We find that the Chancellor did not err in requiring the

filing of a *supersedeas* bond or in vesting title in the appellee, when it was not filed seasonably.

*Decree affirmed, with costs.*